Johnson, J.
Section lb of Article II of the Constitution contains the following provision:
“If conflicting proposed laws or conflicting proposed amendments to the constitution shall be approved at the same election by a majority of the total number of votes cast for and against the same, the one receiving the highest number of affirmative votes shall be the law, or in the case of amendments to the constitution shall be the amendment to the constitution.”
This provision is included in the section relating to initiated proposed amendments. Its terms are clearly applicable to proposals by the general assembly as well as by the initiative. Every reason for the provision as to conflicting proposed amendments which are initiated applies with equal force to amendments proposed by the general assembly which conflict with others submitted at the same election. And as its terms are general and comprehensive, we think it is evident that the constitu *175 tional convention did not regard its repetition as necessary.
The defendant secretary contends that the two proposed amendments set out in the pleadings, voted upon at the election in November, 1918, conflict with each other, and that, therefore, the proposal set up in the answer, having received 479,420 votes, and the amendment set up in the petition, known as the “Classification Amendment,” having received 336,616 votes, the former, under the provision of the constitution above quoted, “shall be the amendment to the constitution.”
The relator, while admitting that the proposed amendment submitted under the joint resolution of the general assembly received the larger number of votes, yet contends that the proposed amendment set up in the petition, the Classification Amendment, does not conflict with the former. The basis of this argument is that although both of the proposed amendments contain the full text of the section of the constitution to which they both related and which they both amended, Section 2 of Article XII, yet the action of the people only related to the changes made. This necessarily proceeds upon the idea that the people took no note of any effect which the proposed change might make in the existing constitution or of its relation to the already established organic law. However, the full text of Section 2, Article XII, as it would read after the proposed amendment or change had been made in it, was set forth in each proposal, and in each case such complete full text was published to the people in the manner required by the constitution as the *176 proposal upon which they were to vote at the election.
By the original Section 2, Article XII, it is provided that all property shall be taxed by a uniform rule at its true value in money. By the proposed classification amendment it is provided that the subjects of taxation shall be classified, and the rate of taxation shall be uniform on all subjects of the same class, and shall be just to the subject taxed. Of course it is conceded that there is a direct conflict in these two constitutional provisions, and it is conceded that if the approval by the people of the proposal by the general assembly operated to readopt original Section 2, Article XII, it received a very much larger vote than the classification amendment, and that the latter would fail.
But it is insisted that the people did not reaffirm or readopt the provisions of Section 2, Article XII, which were not changed by the proposals, and authorities are cited-by counsel in the briefs and at the bar. These authorities relate to the construction of statutes and to their effect upon rights and transactions between the original and amendatory acts. It is urged that these, authorities, and the rules they declare, apply also in the construction of constitutional provisions. This court has recognized and applied that rule. The County of Miami et al. v. The City of Dayton et al., 92 Ohio St., 215, 223, and Shryock v. The City of Zanesville et al., 92 Ohio St., 375, 383.
In State, ex rel. Durr, Auditor, v. Spiegel et al., Budget Commissioners, 91 Ohio St., 13, cited, it is held:
*177 “Where an amendatory act contains the entire section or sections as amended and repeals the original section or sections in compliance with Section 16, Article II of the Constitution, the amended sections are to be given the meaning they would have had if they had read from the beginning as they do as amended, except where such construction would be inconsistent with the manifest intent of the legislature.
“An act amending one or more sections of a statute should be considered in connection with the whole statute of which it has become a part, the object intended to be accomplished by the law, the imperfections to be removed and the changes to be made by the amendment.”
In 1 Sutherland’s Statutory Construction (2 ed.), Section 237, it is said: “So far as the section is changed it must receive a new operation, but so far as it is not changed it would be dangerous to hold that" the mere nominal re-enactment should have the effect of disturbing the whole body of statutes in pari materia which had been passed since the first enactment.”
In McKibben v. Lester, 9 Ohio St., 627, it is held: “Where one or more sections of a statute are amended by a new act, and the amendatory act contains the entire section or sections amended, and repeals the section or sections so amended, the section or sections as amended must be construed as though introduced into the place of the repealed section or sections in the original act, and, therefore, in view of the provisions of the original act, *178 as it stands after the amendatory sections are so introduced.”
These authorities sufficiently sustain the proposition stated, and the questions to which they relate are obvious. The time at which a statute became effective is frequently important to litigants and contracting parties, and unintentional injustice would result, if, in particular circumstances, the taking effect of an amendment in matters as to which the statute was not changed should be held to change the application of the law as to rights which had attached before the amendment. Such for instance as the words “heretofore” or “hereafter,” found in an original act and contained in an amendatory act which had changed the original in other respects than those to which these words related. This was the question presented in Durr v. Spiegel, supra. But while these are salutary rules as to the effect of such amendments, yet they have no relation to the actual fact of the reenactment of the original section as amended. So far as Ohio is concerned, the constitution itself settles that question. Article II, Section 16, provides: “No law shall be revived, or amended unless the new act contains the entire act revived, or the section or sections amended.” There could of course be no decision or legislation which is the equivalent of this plain constitutional requirement.
In The State, ex rel. Godfrey, Taxpayer, v. O’Brien, Treasurer, et al., 95 Ohio St., 166, it is held in proposition six of the syllabus: “The provision of Section 16 of Article II of the Constitution of Ohio, providing that no law shall be revived *179 or amended unless the new act contains the entire act revived, or the section or sections amended, is mandatory.”
The word “amendment” has different meanings which are determined by the connection in which it is used. But when used in connection with the constitution it has obviously a dual meaning, the particular one to be determined by its relationship. An amendment to the constitution, which is made by the addition of a provision on a new and independent subject, is a complete thing in itself, and may be wholly disconnected with other provisions of the constitution; such amendments for instance as the first ten amendments of the constitution of the United States. These were therein referred to as articles in addition to and amendment of the constitution.
Then there is the use of the word “amendment” as related to some particular article or some section of the constitution, and it is then used to indicate an addition to, the striking out, or some change in that particular section. In the former instance the amendment stands by itself, explains itself, and speaks for itself. The legislative body, or the elector, has before him, the whole subject upon which he is to act. But in the latter instance it may be essential for the elector to have before him the section which is proposed to be added to, or subtracted from. If he is to vote intelligently, he must have this knowledge. Otherwise in many instances he would be required to vote in the dark. But when the particular section, with the additions or subtractions shown' therein, is before the elector, this *180 completed result becomes the amendment upon which he expresses his choice.
The procedure thus indicated was followed in this case. In the matter of the amendment proposed by the general assembly the entire Section 2 of Article XII, as amended, was printed upon the ballots, in addition to being published as required by the constitution, and upon the ballot there was stated, in parenthesis, “New Matter in Capitals,” and the new matter was designated by capitals as stated. Every elector who voted upon that proposition had before him, when he voted, the entire section of the constitution as it would read if the proposal were adopted, and when the 479,000 electors .voted in favor of it they stated as clearly as any one can state that they desired that the constitution itself should include the provisions stated on the ballot.
These conclusions are sufficient to dispose of this case. Because of course it is not denied that the uniform taxation section is in direct conflict with the classification proposal; nor that the former received the larger vote.
But how is it as to the classification proposal itself ?
The Constitution, Article II, Section 1 et seq., provides for the submission to the people of proposed amendments to the constitution, which have been initiated by petitions of electors. These provisions are explicit and comprehensive. In Section la it is provided that when a petition signed by the required number of electors has been filed with the secretary of state proposing an amendment to *181 the constitution, “the full text of which shall have been set forth in such petition,” the secretary of state shall submit for the approval or rejection of the electors the proposed amendment in the manner thereinafter provided.
In Section 1g it is provided that a true copy of all laws, or proposed laws or proposed amendments to the constitution, together with an argument or explanation, or both, for, and also an argument or explanation, or both, against, the same shall be prepared.
It is further provided that the secretary of state shall cause to be printed the proposed law, or proposed amendment to the constitution, together with an argument and explanation, not exceeding a total of three hundred words, for each, and also an argument and explanation, not exceeding a total of three hundred words, against each, and shall mail or otherwise distribute a copy of such proposed law, or proposed amendment to the constitution, together with such arguments and explanations for and against the same, to each of the electors of the state, so far as the same may be reasonably possible.
There is no possible misunderstanding of these provisions. The constitution requires that every voter shall have laid before him in as complete and effective a manner as “may be reasonably possible” the proposal upon which he is to vote.
In this case the petition by the electors, and the copy mailed and distributed to the electors, all contained the entire proposed Section 2, Article XII, with the changes at the proper place.
*182 As above stated, it is admitted that the provisions of the “Classification Amendment,” requiring that the general assembly shall classify all subjects of taxation, is in direct conflict with the provisions of original Section 2, Article, XII, which provide for the taxation of all property by uniform rule at its true value in money; and having received fewer votes than the uniform-rule section it cannot be held to have carried.
The case of Gabbert, Admr., v. C., R. I. & P. Ry. Co., 171 Mo., 84, is relied on. In that case two amendments were proposed by the general assembly to be voted upon by the people at the same election and both were adopted. Both were amendments to Section 28, Article II of the Constitution. One provided that the section should be amended by adding at a certain designated place a provision for a two-thirds verdict of a jury in civil cases not in courts of record and a three-fourths verdict in courts of record. The other provided that at a certain other designated place a proviso should be inserted making the convening of the grand jury subject to the discretion of the court.
There was no contention that the two amendments were incongruous, or contradictory or irreconcilable, and the court, at page 95, say: “Every voter, moreover, knew that if he voted for both amendments he was voting to add both to the section and if adopted each would be added in its proposed place to the section and the section and its amendments would then constitute a harmonious section.” There was not in the case a single word *183 rejected which was included in either of the proposals. It was simply found that the language in both of the proposals together constituted one harmonious whole.
But in this case, it is proposed to reject from the proposal of the general assembly the larger part of it, including the entire portion thereof which provides for the uniform taxation of property, and to inject into it the provisions of the initiated or classification amendment, although the former received 140,000 more votes of the electorate than the latter.
There is another reason which in our judgment is fatal to the classification amendment. It will be noted that the first portions of the proposal read as follows: “The General Assembly shall provide for the raising of revenues for all state and local purposes in such manner as it shall deem proper. The subjects of taxation for state and local purposes shall be classified, and the rate of taxation shall be uniform on all subjects of the same class, and shall be just to the subject taxed.” But this was not the only change in the language of original Section 2 of Article XII. In the body of the section, and in the portion thereof providing for exempted property, is included the phrase “institutions of purely public charity.” This phrase was included in the original section as adopted in the Constitution of 1851. From time to time, covering a period of over 60 years, it had received the consideration of this court in a number of cases, and the disposition of the general assembly was towards the passage of laws enlarging exemptions *184 which had been permitted under this provision. Serious question as to the extent of exemptions allowable under this clause began to be raised.
At the time of- the making of the original constitutions the provision named was doubtless sufficient to meet the requirements. As the state grew and expanded new relations grew up. There came to be great benevolent and fraternal societies and orders in our midst, which maintained hospitals, homes and institutions for the care and maintenance of their aged and infirm members, their widows and orphan children. But for them, much of the charitable work of these organizations would have to be done by the state itself.
This phase of the development of our social fabric is only one of many gratifying and similar elements in our growth. Lord Bryce, in his American Commonwealth, comments upon them and refers to an address by President Eliot, in which he said: “The successful establishment and support of religious institutions — churches, seminaries, and religious charities — upon a purely voluntary system, is an unprecedented achievement of the American democracy. * * * The endowment of institutions of education, including libraries and museums, by private persons in the United States is a phenomenon without precedent or parallel, and is a legitimate effect of democratic institutions.”
When the Constitutional Convention met in 1912, in response to this great benevolent spirit and to a compelling sense of justice toward those maintaining such institutions, the phrase “institu *185 tions of purely public charity” was changed so that it should read “institutions used exclusively for charitable purposes.” This clause includes the institutions to which we' have referred. They are, in many cases, not purely public charities, yet they devote themselves exclusively to charitable purposes. Under the 1851 provision they would not be entitled to the exemption. Under the 1912 provision, of course, they would. The classification amendment of last fall returns to the 1851 clause. It strikes at the heart of the great benevolent and humanitarian movements and imposes unjust burdens upon them.
Those who support the classification amendment, which contains this 1851 clause, now say that no attention should be paid to it, because in the official statements concerning the classification amendment and upon the ballot no reference to this change is made.
But the petition signed by more than ten per cent, of the electors, which initiated the proposal, contains the 1851 clause. The contention of relator here encounters an obstacle which is fundamental and vital. The filing of the initiative petition by ten per cent, of the electors is jurisdictional. There was absolutely no right to publish or submit a proposed amendment until the proper petition was filed. That is a constitutional prerequisite. It is also a constitutional prerequisite to jurisdiction that in the petition proposing an amendment to the constitution the full text shall have been set forth. Now, it is conceded that no argument or explanation of the proposed amendment as to *186 charitable institutions was prepared and mailed, as required by the constitution; that in the certificates by the attorney general and secretary of state, and on the official ballot, no reference to it was made. The Constitution, Article II, Section 1 g, requires the ballot to be so printed as to permit an affirmative or negative vote on each proposed amendment to the constitution.
In this case the ballot used as to the classification amendment was as follows:
“ARTICLE XII,
“Section 2
“That the General Assembly shall classify property for taxation purposes.”
No reference whatever was made thereon to the vital change as to charitable institutions and no opportunity was given to the electors to express their decision upon that change, which opportunity the constitution expressly required they should have.
There was in this case, therefore, a clear and unquestioned failure to fulfil the requirement laid down by the constitution as a basis for the valid submission of the proposed amendment.
It is urged, however, that because of the ignoring of this 1851 exemption clause, in the respects pointed out, the clause itself should be disregarded and treated as a mistake. But the electors who signed the initiative petition included therein the 1851 clause. Their proposed amendment made *187 that change. That, and that only, is the proposed amendment which the constitution requires to be submitted. Not only this, but it permits no other to be submitted. Where is there any authority for an administrative officer, or other person, who prepares an explanation, or an official ballot, to decide that he will disregard such clause or omit reference to it upon the ballot? Constitutional provisions cannot be lightly set aside in the performance of administrative duties, however innocently done. Where is the authority of a court to add to, or subtract from, a solemn document prepared and filed pursuant to explicit terms of the constitution for the purpose of altering the charter of the people’s government? We cannot believe that the fundamental law can be taken apart, built up, amended, or dealt with, in that manner.
But surely such a thing should not be participated in, or sanctioned by, courts of last resort. Probably our chief contribution to the science of government is the principle of the complete separation of the three departments of government, executive, legislative and judicial. No feature of the American system has excited greater admiration. It is no part of the function of courts to make the constitution and the laws. Their only anxiety and concern should be for their correct declaration and just enforcement. They can have no more sacred duty, when the making or altering of the organic law is involved, than to insist upon an adherence to the procedure which the people themselves have ordained.
*188 The petition in this case sets up the classification amendment in the exact terms petitioned for, including the 1851 clause as to charitable institutions, and the prayer of the petition is that this court issue a writ of mandamus to compel the defendant to publish the same as an amendment to the constitution. '
The rule is elementary and universal that before a writ of mandamus is issued the plaintiff must show himself clearly entitled to the writ prayed for, and the writ, as above stated and prayed for, is the only one which in this case the court could in any event, or upon any view, have authority to issue.
We are clearly of the opinion that the writ should be denied.

Writ denied.

Nichols, C. J., Matthias and Wanamaker, JJ., concur.
Jones and Robinson, JJ., dissent.